## Newsome v. Commonwealth.

June 13, 1941.

448

Joe P. Tackett for appellant.

Hubert Meredith, Attorney General, and R. Vincent Goodlett for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming.

The appellant, Caleb Newsome, was indicted jointly with Alvis Newsome and Will Dillow for the murder of

Taulbie Newsome, a brother of appellant and of Alvis Newsome. The indictment was in two counts, the first charging the defendants with conspiracy to commit murder. On a separate trial of appellant he was convicted of voluntary manslaughter and sentenced to the penitentiary for 21 years and this appeal follows. The case was not submitted to the jury on conspiracy.

Grounds for reversal urged in the brief are: 1) the verdict is flagrantly against the evidence, 2) error in admitting incompetent evidence, 3) improper conduct of the trial judge. Proper consideration of grounds (1) and (2) requires a statement not only of the facts at the time of the actual killing but of the background of events leading up to the difficulty.

The deceased, the appellant and others jointly indicted with him, as well as most of the witnesses, were members of a local union of the United Mine Workers of America, the appellant being president of the local union. Several weeks before the killing, which occurred on July 17, 1940, Walter Edmonds, a member of the union, had been discharged at the mine and, because of his discharge, the members of the union ceased work. Evidence for the Commonwealth tended to establish that appellant told the members not to go back to work until Edmonds was reinstated, while evidence for appellant was to the effect that he and a field worker of the union advised the miners that they were violating their contract by stopping work and urged them to return. The miners returned to work in about a week, but stopped work a second time because of Edmond's discharge. Shortly thereafter appellant and Dillow were discharged by the Company and appealed to the labor board at Ashland.

Early in June, before the hearing of the appeal at Ashland, new officers of the local union were nominated to begin their terms July 1—it was the custom of the union to nominate officers at one meeting in June and elect them at a later meeting in the same month. In view of the existing conditions, it was advised by a field representative of the union that the second meeting for the election of the officers be postponed, which was accordingly done.

About a week before the killing the deceased, to-

gether with Creed Newsome, his uncle, and others, went to Ashland to attend the hearing of the appeal. After the hearing three of the men who had been before the labor board (Dillow, Edmonds and Vaughn) filed charges of "discrimination" or "wilfully wronging a brother", against seven members of the local union, including the deceased and Creed Newsome, his uncle. The trial upon these charges was set for July 17, the day of the killing.

On that day the meeting was called to order by appellant, as president, who thereupon announced the charges against the 7 men. Approximately 35 members of the union attended although there was a membership of approximately 200. The meeting was held in the school building at Ligon.

Testimony of the witnesses as to what occurred at the time of the killing is highly contradictory as to detail, owing, no doubt, to the excitement under which the witnesses were laboring but the sum and substance of it, gathered by us from a careful consideration of the testimony as a whole, is that when appellant read the charges against the seven men and announced that the trial would proceed Creed Newsome, uncle of appellant and the deceased, rose to his feet and told the appellant he was out of order and had no right to try the case, meaning, apparently, that appellant's term of office as president had expired. Appellant had some conversation with Creed, who thereupon took his seat. The deceased rose to his feet and with an oath told appellant that he would never try him on the charges. About the time the deceased rose to his feet, probably momentarily thereafter, appellant rose to his feet and as he did so reached in his shirt for a pistol. It is hard to gather from the evidence the exact time at which the deceased drew his pistol, but it seems probable that it was drawn before appellant drew his. However, though the deceased had his pistol in his hand, he made no immediate attempt to shoot appellant and apparently did not point his pistol at him. When appellant rose to his feet and put his hand inside his shirt to draw his pistol, he came from behind the desk at which he was sitting and started towards the deceased for the purpose, as he said, of grabbing the deceased's pistol. Other witnesses substantiate appellant by testifying that when appellant

advanced towards the deceased he attempted to grab the deceased's pistol. One witness for appellant testified that appellant shoved his pistol into the deceased's stomach and ordered him to stand back and that when he did so the deceased fired. Appellant and some of his witnesses testified that appellant turned his back on the deceased and that the deceased fired while he had his back turned. When deceased fired, the bullet struck appellant in the back of the neck and he fell to the floor. All had jumped to their feet by this time and, apparently, other pistols were out although it is impossible to tell the order in which the firing then proceeded. In any event, after shooting appellant, the deceased turned and started shooting at his brother, Alvis, and about the same time Dillow began firing. While appellant was lying on the floor and while the deceased was firing at Alvis, appellant shot the deceased six times. Approximately 30 shots were fired, and when the melee was over the deceased and Creed Newsome were lying on the floor dead and appellant and Alvis had been shot. There was some evidence, rather weak, as to threats made by appellant against the deceased and evidence of a convincing character as to threats by the deceased against appellant and Dillow.

After a careful consideration of the evidence, the sum and substance of which we have stated as fairly as possible from appellant's standpoint, and in the most favorable light to him, we have concluded that the verdict is not flagrantly against the evidence. We must confess that this is one of those border line cases which closely approaches to establishing self-defense as a matter of law but, after all, the jury must be allowed great latitude in cases of this character. When an accused admits a homicide and endeavors to justify it on the ground of self-defense, it is incumbent on him to satisfy the jury that the homicide was excusable and it must be convincingly established that the killing was in self-defense. Huff v. Com., 275 Ky. 578, 122 S. W. (2d) 143, and cases therein cited. While the deceased probably drew his pistol first, he did not at that time make any effort to shoot the appellant. Appellant, when he drew his pistol and started towards the deceased, and, as one of his witnesses said, poked his pistol in the deceased's stomach, apparently evidenced a willingness to engage in mutual combat such as to justify the jury in finding him

guilty of voluntary manslaughter. A mutual combat voluntarily engaged in between two or more persons constitute an affray. Gillis v. Com., 202 Ky. 821, 261 S. W. 591. We conclude that the evidence was sufficient to sustain the verdict of the jury in finding appellant guilty of killing in sudden affray.

The complaint that incompetent evidence was admitted arises out of the fact that a witness for the Commonwealth was permitted to testify that under the rules of the union appellant's term of office as president of the local union expired on July 1 and that nominations for officers were made at a meeting early in June and the election held at a later meeting in that month. It is insisted that this was prejudicial error for the reason that the written rules of the union should have been introduced in evidence instead of permitting the witness thus to testify. Though it be assumed that error was committed in permitting oral testimony as to these rules, we see nothing prejudicial to the appellant in its admission since he himself testified that ordinarily his term of office would have expired on July 1. And, further, appellant was permitted to testify that the election was not held on account of instructions from officers of the union and that therefore he continued in office as president until his successor was elected. This testimony was not even contradicted by the Commonwealth. Clearly in these circumstances there was no prejudicial error committed against appellant. A further complaint is made that the court erred in permitting evidence that a field worker of the union told the miners at one of the meetings that the local members were striking illegally. This complaint is clearly without merit since the appellant himself, testified to exactly the same thing.

The most serious complaint made as to the admission of incompetent evidence is as to the action of the court in permitting several witnesses to testify as to threats made by Dillow, indicted jointly with appellant against the deceased. When this evidence was admitted the jury were instructed that it could be considered only in the event the jury found that a conspiracy had been formed between Dillow and appellant to kill the deceased. The evidence wholly failed to establish a conspiracy and at the conclusion of the Commonwealth's evidence motion was made by appellant to exclude this testimony

and the motion was overruled. However, at the conclusion of all the evidence the court instructed the jury to disregard this testimony and not consider it. We fail to see prejudicial error to appellant in this action on the part of the court. In conspiracy cases a wide latitude in the range of testimony is necessarily given the Commonwealth and it is only when all the evidence is in that the court can determine whether or not a conspiracy has been proven. The mere fact that the court excluded the testimony at the conclusion of all the evidence rather than at the conclusion of the Commonwealth's evidence seems to us in no wise prejudicial. It is possible that the appellant's own evidence might have established a conspiracy although the evidence for the Commonwealth failed to do so. Apparently the practice adopted by the trial court has been given approval by this court in numerous instances. See Crawford v. Com., 242 Ky. 80, 45 S. W. (2d) 824 and numerous cases therein cited.

Much complaint is made by counsel for appellant as to the conduct of the trial judge in asking numerous questions. It is insisted that the questions clearly indicated an attitude of hostility on the part of the court. The instances referred to are so numerous that it would unduly lengthen this opinion to mention them and discuss them separately. We may say therefore that we have given careful consideration to appellant's argument in this connection and fail to find that they evidence an attitude of hostility on the part of the court sufficient to justify a reversal. As a matter of fact, it is admitted in appellant's brief that the trial judge had no personal interest in the case either way. In view of this admission it is unlikely that an air of hostility on the part of the court towards appellant was indicated to the jury. We therefore fail to see in what way the appellant was substantially prejudiced by the questions asked by the court. On the whole it appears that appellant had a fair and impartial trial.

Judgment affirmed.